**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Deborah Lindenberger, Bonita Harris, and Maria Duran, | Case No. 22-cv-427 |
| *individually and on behalf of all others similarly situated*, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| Cane Bay Partners VI, LLLP, Dimension Credit (Cayman), L.P., Strategic Link Consulting, LP, Esoteric Ventures, LLC, InfoTel International Ltd., M. Mark High, Ltd., Kirk Chewning, David Johnson, Kim Anderson, Jay Clark, Does 1-20, Scott Soli, Chief Executive Officer of LCO Financial Services, *in their official capacity*, Lee Harden, Chief Operating Officer of LCO Financial Services, *in their official capacity*, Anoosh Motamedi, Chief Information Officer of LCO Financial Services, *in their official capacity*, Trina Starr, Director of Operations of LCO Financial Services, *in their official capacity*, Louis Taylor, Chairperson of the LCO Tribal Governing Board, *in their official capacity*, Lorraine Gouge, Vice-Chairperson of the LCO Tribal Governing Board, *in their official capacity*, Tweed Shuman, Secretary/Treasurer of the LCO Tribal Governing Board, *in their official capacity*, Glenda Barber, LCO Tribal Governing Board Council Member, *in their official capacity*, Don Carley, LCO Tribal Governing Board Council Member, *in their official capacity*, Gary "Little Guy" Clause, LCO Tribal Governing Board Council Member, *in their official capacity*, Michelle Beaudin, LCO Tribal Governing Board Council Member, *in their official capacity*, | |
| Defendants. | |

COME NOW Plaintiffs Deborah Lindenberger, Bonita Harris, and Maria Duran, on behalf of themselves and all individuals similarly situated, by counsel, and for this Class Action Complaint against Defendants, allege as follows:

<u>**GENERAL ALLEGATIONS**</u>

1.      This is a case about a scheme to make online short-term loans that carry triple-digit interest rates, often exceeding 500%, and that are illegal in many states.

2.      High interest loans often target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities.  Consumers often take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.      In recent years, online lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws, including the "off-shore" scheme and the "tribal" or "sovereign" lending scheme.

4.      In the so-called "off-shore model," the lender is purportedly located off-shore, such as in Belize, but in reality, the lender operates in the United States.  The purpose of the off-shore model is to attempt to evade the usury laws and discourage regulators by purportedly operating outside the United States.

5.      In 2013, the Department of Justice initiated "Operation Chokepoint" which investigated banks that did business with companies that the DOJ believed to be at high-risk for fraud and money laundering.  As a result of Operation Chokepoint, the off-shore model of lending significantly declined as lenders could not find banks or payment processors willing to do business with a purportedly off-shore online lending business.  Since Operation Chokepoint, online lenders have transitioned to tribal lending schemes.

6.     In a tribal lending scheme, the lender affiliates with a Native American tribe to attempt to enhance the appearance of tribal ownership and insulate the scheme from federal and state law by piggy-backing on the tribe's sovereign legal status and the tribe's general immunity from suit under federal and state laws.

7.     The purpose of the scheme is so that the non-tribal schemers "can use tribal immunity as a shield for conduct of questionable legality."  *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

8.     Sometimes these schemes are referred to as "rent-a-tribe" schemes.  In such a scheme, like that at issue in this case, the tribe lends its sovereignty to provide an arguable shield to lawsuits asserting violations of state usury law, but otherwise has minimal involvement or oversight of the lending operations.  Instead, the non-tribal persons and entities control the operations of the lender and reap the vast majority of the profits.

9.     In a tribal lending scheme, the tribe sets up a company that purportedly makes the loans while entering into an agreement with a servicing or consulting company that controls the entire business and retains the vast majority of the revenue from the scheme, leaving the tribe with one or two percent of the revenue.

10.     Tribal lending schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state usury law, with the vast majority of the revenues going to non-tribal entities, and tribes receiving one or two percent of the revenue.

11.    In recent years, these schemes have come under increasing scrutiny from regulators, with one prominent perpetrator convicted and sentenced to 16 years in prison related to federal racketeering and truth-in-lending law offenses.[1]

12.    In this case, non-tribe members David Johnson, Kirk Chewning, Kim Anderson, and Jay Clark, and Johnson and Chewning's company Cane Bay Partners VI, LLLP, and its affiliates and subsidiaries, including but not limited to, Dimension Credit (Cayman) L.P., Strategic Link Consulting, LP, Esoteric Ventures, LLC, InfoTel International Ltd., M. Mark High, Ltd. (collectively, the "Cane Bay Defendants") ran the lender Blue Trust Loans,[2] a purportedly tribal entity of the Lac Courte Oreille Band of Lake Superior Chippewa Indians (the "Tribe" or "LCO") in Wisconsin that makes usurious loans to persons located throughout the United States, including Plaintiffs.

13.    Johnson and Chewning and their company Cane Bay have been running lending schemes for years.  These schemes have been highly lucrative.  According to Bloomberg News, Johnson owns a 65-foot yacht called *Living the Dream.*  Johnson also owns a 49-foot yacht called *Renewed Interest.*

---

[1] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

[2] Hummingbird Funds, LLC d/b/a Blue Trust Loans was the name of the lender run through bluetrustloans.com, and is the name on Plaintiffs' loan documents.  As of March 31, 2022 Internet Archives, bluetrustloans.com was still in operation under that name, but currently that site now states "Blue Trust Loans is transitioning to eLoan Warehouse."  (*See* www.bluetrustloans.com, as of July 11, 2022.)  eLoanWarehouse.com, based on Internet Archives, appears to have become active by at least January 27, 2022 through the date of this Complaint, and is the d/b/a of "Opichi Funds, LLC" which is, as Blue Trust Loans put forth as well, "wholly-owned" by the Tribe.  (*See* www.eloanwarehouse.com, as of July 11, 2022.)

14.    The Tribe has admitted that Chewning and his cohorts ran a "rent-a-tribe scheme" using the Tribe's sovereignty to try to shield usurious lending from scrutiny.  In a complaint filed in this District by the Tribe against the Cane Bay Defendants earlier this year, the Tribe stated:

> Kirk Chewning, through Cane Bay and Dimension Credit, orchestrated a scheme to exercise de facto control over the Tribe's lending businesses to facilitate an illegal lending enterprise and charge consumers up to 730% annual interest for loan. Defendants, playing on the Tribe's desperate desire to diversify its limited economy by creating new opportunities and governmental support for its people, held themselves out as industry experts and successful businessmen willing to consult on the development of, and provide services for, the Tribe's lending venture. However, unbeknownst to the Tribe, Chewning and Cane Bay really sought the framework of a thinly-veiled, carefully structured "rent-a-tribe" scheme — a business that was tribally owned and operated on paper, but in reality, merely a front for non-tribal companies and individuals to continue their illegal offshore operations and skim money from the Tribe.

*Lac Courte Oreilles Financial Services, LLC, et al. v. Cane Bay Partners, VI, LLLP*, Case No. 3:22-cv-344 (W.D. Wis.) (ECF No. 1 ¶ 2) (hereinafter "LCOFS Compl.").

15.    Plaintiffs, on behalf of themselves and the Classes set forth below, seek to recover damages and penalties under state and federal law for the usurious interest and fees obtained by the Cane Bay Defendants, as well as prospective injunctive and declaratory relief against the individuals on the LCO Tribal Governing Board and the leadership of LCO Financial Services, LLC, including the Chief Executive Officer, Chief Operating Officer, Chief Information Officer, and Director of Operations (collectively, the "Tribal Defendants") (together with the Cane Bay Defendants, "Defendants"), to prevent their continuous and ongoing violations of state and federal law.

## JURISDICTION AND VENUE

16.    This Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

17.    This Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs and at least one Defendant are citizens of different states and the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), (3) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and Defendants are subject to the Court's personal jurisdiction with respect to the claims alleged herein.  The Tribe admits that its relationship with the Cane Bay Defendants was centered in this District.  As the Tribe alleged in support of its complaint against the Cane Bay Defendants filed in this District, "a substantial part of the events or omissions giving rise to [the Tribe's] claims occurred in this district."  (LCOFS Compl. ¶ 19.)  Moreover, the alleged lending enterprise, and each of the individuals who participated in it, continuously and systematically operated in the state of Wisconsin.  For example, the Credit Agreement between the Tribe and Dimension Credit, the entity which provided the capital for the lending enterprise, provided that the money from Dimension Credit should be deposited at Chippewa Valley Bank at 607 Main Street, Bruce, Wisconsin 54819.  *Lac Courte Oreilles Financial Services, LLC,* ECF No. 21-1.  Further, LCO Financial Services and its officers maintained a PO Box in this District at which it received notices under the Credit Agreement (PO Box 1506 located at 10597 Main St, Hayward, WI 54843). (*Id.*) To this day, the eLoanWarehouse website lists PO Box 1753 on its "Contact Us" webpage,[3] which is also located at 10597 Main St, Hayward, WI 54843.

19.    Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants transacted their affairs in this District and Division.

---

[3]*See* https://eloanwarehouse.com/contact-us.

## THE PARTIES

20.     Plaintiff Deborah Lindenberger is a natural person and resident of South Carolina.

21.     Plaintiff Maria Duran is a natural person and resident of Illinois.

22.     Plaintiff Bonita Harris is a natural person and resident of Illinois.

23.     Defendant Kirk Chewning is a natural person and resident of the U.S. Virgin Islands.

24.     Defendant David Johnson is a natural person domiciled in the U.S. Virgin Islands.

25.     Defendant Jay Clark is a natural person residing in the state of Georgia, and serves as Chief of Staff to Defendant Cane Bay Partners VI, LLLP, and General Manager and CFO of Defendant Strategic Link.

26.     Defendant Kim Anderson is a natural person and served as the Chief Executive Officer for several of Defendants' loan servicer entities.

27.     Defendant Cane Bay Partners VI, LLLP is a limited liability limited partnership based in the U.S. Virgin Islands.  Chewning and Johnson are the co-founders and officers at Cane Bay Partners.

28.     Defendant Dimension Credit (Cayman), L.P. is a limited partnership based in the Cayman Islands.  It is owned and controlled, directly or indirectly, by Chewning.

29.     Defendant Strategic Link Consulting, LP is a limited partnership based in the state of Texas.  It is an affiliate business of Cane Bay under the control of Chewning.

30.     Defendant Esoteric Ventures, LLC, d/b/a Max Touch Services is a limited liability company based in the state of Utah.  It is an affiliate business of Cane Bay under the control of Chewning.

31.     Defendant InfoTel International, Ltd., d/b/a Voyse International is an international business company based in Belize.  It is an affiliate business of Cane Bay under the control of Chewning.

32.     Defendant M. Mark High, Ltd. is an international business company based in Belize.  It is an affiliate business of Cane Bay under the control of Chewning.

33.     Defendant Scott Soli serves as the current Chief Executive Officer of LCO Financial Services. In that role, Defendant Soli has "direct oversight and control over Hummingbird and Miina," (LCOFS Compl. ¶ 39), and any other lending entity under LCO Financial Services. Defendant Soli communicates directly with Defendant Chewning. (*Id.* ¶¶ 40, 43.)  Plaintiffs seek relief from Defendant Soli in their official capacity only.

34.     Defendant Lee Harden serves as the current Chief Operating Officer of LCO Financial Services and was formerly the Chairman.  Defendant Harden signed the Credit Agreement with Dimension Credit in their official capacity on behalf of LCO Financial Services as the "Guarantor" for the capital used to finance usurious loans to consumers. *Lac Courte Oreilles Financial Services, LLC,* ECF No. 21-1.  Plaintiffs seek relief from Defendant Harden in their official capacity only.

35.     Defendant Anoosh Motamedi serves as the current Chief Information Officer of LCO Financial Services.  Defendant Motamedi's LinkedIn profile states that in their role they have helped position the existing consumer lending entities for growth and launched new online lending brands.[4]  Plaintiffs seek relief from Defendant Motamedi in their official capacity only.

36.     Defendant Trina Starr serves as the current Director of Operations for LCO Financial Services.  Defendant Starr's LinkedIn states that they are responsible for "small-dollar

---

[4] *See* https://www.linkedin.com/in/anoosh-motamedi/ (as of November 10, 2022).

tribal lending/technology lease eCommerce operations" and that in their role they oversee daily operations and advance the expansion of the business, and oversee and ensure compliance with applicable rules and regulations.[5]  Plaintiffs seek relief from Defendant Starr in their official capacity only.

37.    Defendant Louis Taylor serves as the current Chairperson of the LCO Tribal Governing Board.  Plaintiffs seek relief from Defendant Taylor in their official capacity only.

38.    Defendant Lorraine Gouge serves as the current Vice-Chairperson of the LCO Tribal Governing Board.  Plaintiffs seek relief from Defendant Gouge in their official capacity only.

39.    Defendant Tweed Shuman serves as the current Secretary/Treasurer of the LCO Tribal Governing Board.  Plaintiffs seek relief from Defendant Shuman in their official capacity only.

40.    Defendant Glenda Barber serves as a current Council Member of the LCO Tribal Governing Board.  Plaintiffs seek relief from Defendant Barber in their official capacity only.

41.    Defendant Don Carley serves as a current Council Member of the LCO Tribal Governing Board.  Plaintiffs seek relief from Defendant Carley in their official capacity only.

42.    Defendant Gary "Little Guy" Clause serves as a current Council Member of the LCO Tribal Governing Board.  Plaintiffs seek relief from Defendant Clause in their official capacity only.

43.    Defendant Michelle Beaudin serves as a current Council Member of the LCO Tribal Governing Board.  Plaintiffs seek relief from Defendant Beaudin in their official capacity only.

---

[5] *See* https://www.linkedin.com/in/trina-starr-0724337/ (as of November 10, 2022).

## STATE USURY AND CONSUMER PROTECTION LAWS[6]

44.     Prior to March 21, 2021, under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" meant a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less.  205 ILCS 670/15.

45.     Small consumer loan lenders are required to be licensed to make loans.  205 ILCS 670/1.  A licensed lender may charge interest rates up to 99%.  *See* 205 ILCS 670/17.2(a)(1), (b)(3).

46.     Prior to March 21, 2021, if a lender was unlicensed, annual interest was capped at 9%: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest."  *See* 815 ILCS 205/4(1).

47.     At all times, if an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

48.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%.  815 ILCS 123/15-1-1, *et seq.*

---

[6] Usury laws are not unique to the United States of America.  Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin."  Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012).  Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country."  Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

49.    "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan."  815 ILCS 123/15-5-10.

50.    Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

51.    The Illinois Consumer Fraud Act provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce.  815 ILCS 505/2; 815 ILCS 550/10a.

52.    Defendants were never licensed to lend in Illinois.

53.    Under South Carolina law, a consumer loan is a "loan made by a person regularly engaged in the business of making loans in which the debtor is a person," the debt is "incurred primarily for a personal, family, or household purpose"; "the debt is payable in installments or a loan finance charge is made"; and "either the principal does not exceed twenty-five thousand dollars or the debt is secured by an interest in land [ ]."  S.C. Code § 37-3-104.

54.    For lenders that are not supervised lenders, the maximum finance charge is 12% annually.  S.C. Code § 37-3-201.  Supervised lenders are those that are licensed and regulated by the South Carolina Consumer Finance Division.

55.    Defendants were never licensed in South Carolina to make loans.

**<u>CANE BAY DEFENDANTS' SCHEME TO AVOID USURY LAWS</u>**

56.    Johnson and Chewning have a long history in online lending.  Per the Tribe: "Chewning and Johnson have a history of off-shore online lending management and together have made millions of dollars through the exploitation of impoverished Indian tribes across the country."  (LCOFS Compl. ¶ 25.)

57.     In 2009, Johnson and Chewning organized Cane Bay in the Virgin Islands for tax avoidance purposes.  According to Bloomberg News, ex-employees of Cane Bay said that Cane Bay had no other business other than running online lenders.

58.     Johnson and Chewning organized Cane Bay for the purpose of evading state usury laws, and collecting illegal interest on short-term loans from consumers located throughout the United States, including in Illinois and South Carolina.

59.     Johnson and Chewning were owners of Hong Kong Partners which made online loans supposedly from Belize under the names "Cash Yes" and "Cash Jar."  Hong Kong Partners was shut down after Operation Chokepoint.

60.     Johnson and Chewning were also both executives at TranDotCom, an information system technology company that keeps records for online payday lenders, including records regarding outstanding loans, their terms, and payment histories.  TranDotCom is currently affiliated with Defendant Strategic Link, where Johnson and Chewning are owners.

61.     Strategic Link offers to provide "turnkey" "lending solutions" to payday lenders. It claims to be powered by "TranDotCom technology," including "marketing," "underwriting," "risk management," "auto payment and support," "rehabilitation of consumer debt," "financial reporting," "legal and compliance," "portfolio management," and a "contact center." http://www.slchq.com/turnkey-solution/ (last accessed June 27, 2022).

62.     Rather than complying with state lending and licensing requirements, the Cane Bay Defendants entered into a tribal lending scheme with the Tribe.

63.     The supposedly tribal loans are made through "Blue Trust Loans," "Ladder Credit," and now, as of at least January 2022, "eLoanWarehouse," all of which purport to be "wholly owned" by the Tribe.

64.     The Tribe, Lac Courte Oreilles Band of Lake Superior Chippewa, is located in Hayward, Wisconsin, and has an enrollment of 6,000 members.  (glitc.org/tribes/laccourte.)

65.     The Tribe's lending entity is operated through "LCO Financial Services."  LCO Financial Services, LLC was instituted in 2013, to "further the economic interests for development of online business ventures."  *Shmakova v. Hummingbird Funds, LLC*, No. 5:19-cv-01284 (N.D. Cal. Sept. 10, 2019) at ECF No. 41-2.  The resolution was executed by William Morrow, Vice Chairman, at that time, of the Tribal Governing Board.

66.     LCO Financial Services is associated with the online lending site www.bluetrustloans.com under the name "Hummingbird Funds," and www.laddercredit.com under the name "Miinan Funds" (https://www.lcofinancial.com/; https://web.archive.org/web/20220206001911/https://www.bluetrustloans.com/; https://www.laddercredit.com/.)

67.     Blue Trust Loans has since been "transitioned" to "eLoanWarehouse" which is purportedly owned by Opichi Funds, LLC, which in turn is owned by Lac Courte Oreilles Financial Services II, LLC, an instrumentality of the Lac Courte Oreilles Band of Lake Superior Chippewa.

68.     These lenders offer high-interest short term loans that charge in excess of 500% annual interest.  These loans have interest rates that exceed more than two times any state interest caps.  These loans are purportedly governed by tribal law and require arbitration or dispute resolution proceedings to be conducted under tribal law.

69.     Although these lenders purport to be entities controlled by the Tribe on their websites and contracts, in reality, these lenders are merely fronts for Johnson's and Chewning's businesses which are operated through non-tribal entity Cane Bay Partners and the other non-tribal companies associated with Johnson and Chewning.

70.     Johnson, Chewning, Cane Bay, and other persons and entities affiliated with Johnson and Chewning, run the lending business, including securing funding, registering domains, designing the websites, marketing the business, underwriting and approving loans, handling customer service, and collecting profits.  LCO Financial Services further alleged that the Cane Bay Defendants cause "[i]nterstate transfers of funds to and from [the Tribe's] customers, with the overall intent of furthering the rent-a-tribe scheme . . . ."  (LCOFS Compl. ¶ 72.)  The Tribe has had little meaningful involvement in the business.

71.     In or around late 2012, the Tribe met with Chewning and Johnson and in 2013, Chewning traveled to Hayward, Wisconsin and met with Tribal officials to present his business proposal.

72.     Following that meeting, the parties negotiated an agreement for the servicing and operation of the Tribe's first lending iteration, "Oasis Funds."

73.     The servicing and operation of the tribal lender was to be handled by Cane Bay and its affiliate servicing companies, including Strategic Link, Esoteric, InfoTel, M. Mark High, Ltd., which would together provide underwriting, marketing, call center coverage, training, and access to credit. Strategic Link also held data regarding the portfolio of loans made by the enterprise, including past financials, bank statements, and aggregate bad debt write-off calculations.  (LCOFS Compl. ¶ 50.)  Strategic Link also purchased leads for Hummingbird and Miinan.  (*Id.*)

74.     Dimension Credit was to provide the financing.  Dimension Credit was owned and controlled by Chewning.  The Credit Agreement between Dimension and the Tribe contains a requirement that the Tribe's financial services organization and the Tribal lending entity Hummingbird Funds, LLC, maintain the contractual agreement with Cane Bay and the servicing affiliates, or face immediate default of the loan.

75.     The servicing documents were signed in 2014 for a five year term.  *See Shmakova* at ECF No. 41-6 (Hummingbird Funds', "wholly-owned subsidiary of LCO [Financial Services]," Servicing Agreements with Cane Bay Partners, and Limited Waiver of its Sovereign Immunity approved).

76.     These Servicing Agreements were: (1) "Strategic Management Consulting, Risk Management and Analytics Services Agreement; between Hummingbird and Cane Bay Partners VI, LLLP;" (2) "Support Services Agreement; between Hummingbird and M. Mark High, Ltd.;" (3) "Support Services Agreement; between Hummingbird and Esoteric Ventures, LLC d/b/a Max Touch Services;" (4) "Support Services Agreement; between Hummingbird and InfoTel International, Ltd.;" and (5) "Consulting Agreement; between Hummingbird and Strategic Link Consulting, LP."  (*Id.*)

77.     In its complaint against Cane Bay, LCO Financial Services alleged that the Servicing Agreements and Credit Agreement "ensure that Defendant Chewning would be able to exercise control over the Tribe's operation, cash flows, business decisions, and cash distributions." (LCOFS Compl. ¶ 29.)

78.     The Cane Bay Defendants then began to run the business behind the Tribe's front. This included handling marketing, customer service, underwriting, sourcing funding for the loans, handling the business accounts, decision-making on how to pay business expenses, maintaining the lending portfolio data, collecting on loans, calculations for what loans to write-off, purchasing of leads for the portfolios, and determining how to direct profits.  (LCOFS Compl. ¶¶ 27, 29, 34, 38, 40, 41, 42, 44, 50.)  Per the Tribe, "the Tribe earned the bare minimum while Cane Bay took a significant cash sweep."  (*Id.* ¶ 30.)  The Tribe admits that the arrangement between the parties

"provide[d] a mechanism for [the Cane Bay] Defendants . . . to enrich themselves by collecting on loans whereby they charged consumers up to 730% interest annually."  (*Id.* ¶ 57.)

79.    In March 2019, the Tribe announced a renewal of its LCO Financial Services' contract with Cane Bay, which was described as "our service providers." (https://www.lcotribe.com/post/state-of-the-tribes-address-from-lco-chairman-louis-taylor;  *see also* 01/07/2019 Tribal Governing Board Meeting Minutes ("Approving the Second Extension Addendum and Amendment of the Strategic Management Consulting, Risk Management and analytical Services Agreement between Cane Bay Partners VI, LLLP and Hummingbird Funds").)

80.    The LCO Tribal Chairman Louis Taylor stated that the "deal has the potential to generate up to $4 million per year for our Tribe, and if the operation proves even more successful, over the 9.25-year life of the contract, it is projected to bring in up to $70 million.  In addition to these long-term projected revenues, as part of the new deal, Cane Bay has agreed to make a community investment to Lac Courte Oreilles in the amount of $1.8 million, which we received on Thursday, March 7."   (https://www.lcotribe.com/post/state-of-the-tribes-address-from-lco-chairman-louis-taylor.)

81.    This "community investment" was consideration for the longer term for the renewed agreements, which Cane Bay demanded be for over nine years instead of the prior five.

82.    Later that year, LCO Financial Services opened a remodeled call center on the reservation with 23 employees.  (https://www.lcotribe.com/post/grand-opening-held-for-new-lco-financial-services-building.)

83.    In the press release regarding the new call center facility, a representative of Strategic Link was on-site, described as "[r]epresenting Strategic Link, partners with Cane Bay,

the service provider for LCO [Financial Services], was Stephen Abbot who spoke to community members [and] said he came from Atlanta, GA because he wanted to celebrate with LCO." (*Id.*)

84.     The article went on to quote the LCO Financial Services Chairman, and Tribal Governing Board member, Tweed Shuman, as stating that "We should all be so very proud of our huge success starting from a meeting in the snow five years ago." (*Id.*)

85.     The Chief Operating Officer of Strategic Link, Jennifer Kuechler, commented on the new call center. (*Id.*)

86.     The CEO of LCO Financial Services was quoted as stating "he understands there are a lot of people in the lending industry that case a dark shadow, but LCO wanted to do things legally, and we're going to persevere.  He talked about the Lac Vieux Desert Chairman, Jim Williams, who came to Lac Courte Oreilles five years ago and showed how the lending entity can be done." (*Id.*)

87.     Lac Vieux Desert Chairman Williams was a defendant in a pending class action alleging that his tribe was part of an illegal lending enterprise operating as Big Picture Loans with a Puerto Rico-based version of Chewning and Johnson, Matt Martorello.  *See generally, Williams v. Big Picture Loans*, No. 17-cv-461 (E.D. Va.).

88.     The article included a thank you to "outside council [sic] from Rob Rosette." (https://www.lcotribe.com/post/grand-opening-held-for-new-lco-financial-services-building.) Rob Rosette was involved in the orchestration and brokering of multiple rent-a-tribe payday lending enterprises.  *See, e.g., Williams*; *Williams & Cochrane, LLP v. Robert Rosette*, No. 17-cv-01436 (S.D. Cal.).

89.     In an article from that same month, September 2019, regarding the LCO Financial Services' revenues for the year, it states that the entity cannot forecast FY20 budget yet but had

"asked our service provider to at least give us the ball park estimate." (https://www.lcotribe.com/post/lco-financial-services-director-gives-report-to-tgb.)

90.    It notes that previously the Tribe only benefitted from 1.8% of the LCO Financial Services' revenues. (*Id.*)

91.    This structure of operations remained in place until 2020, with the hiring of Defendant Soli as the new CEO for LCO Financial Services, who began investigating the true nature of the arrangement with Cane Bay and its affiliates.

92.    In 2022, the relationship had become increasingly hostile, and Cane Bay made a multi-million buy out demand, and the servicing affiliates ceased work on the lending portfolios. The Tribe in turn filed suit against Cane Bay, Chewning, the servicers, and Dimension Credit, asserting multiple allegations of embezzlement, RICO violations, and breach of contract-related claims.

93.    The LCO Financial Services' complaint against Cane Bay and affiliates lays bare the "rent-a-tribe" set up and illustrates the control Chewning, Johnson, and their companies exercised over the activities, operations, and revenues, of the lending entities.  (*See generally* LCOFS Compl.)

94.    This is not Cane Bay, Chewning, and Johnson's only tribal lending scheme – they have orchestrated and run a similar scheme with the MHA Nation as well.  *See Manago v. Cane Bay Partners VI, LLLP*, No. 1:20-cv-00945 (D. Md. Dec. 15, 2020) at ECF No. 40.

## TRIBAL DEFENDANTS' ROLE IN THE ENTERPRISE

95.    The LCO Tribal Governing Board is the governing authority for the Tribe and has the power to make laws and resolutions pursuant to the Tribe's Constitution.

96.     Pursuant to Article V, Section 1, of the Amended Tribal Constitution, the Governing Board has the powers, *inter alia*, "[t]o negotiate, make and perform contracts and agreements of every description, not inconsistent with law or with any provisions of this Constitution, with any person, association, or corporation, with any county, or with the State of Wisconsin or the United States," "[t]o engage in any business that will further the social or economic well-being of members of the Band or undertake any programs or projects designed for the economic advancement of the people," "[t]o organize, charter and regulate any association or group, including a housing authority, for the purpose of providing social or economic benefits to the members of the Band or residents of the reservation," and "[t]o regulate, by enactment of ordinances, the conduct of business within the territory of the band, including the power to impose taxes or license fees upon members and non-members doing business within the reservation."

97.     The Tribe first met Chewning and Johnson in late 2012 and they proposed a business partnership with the Tribe.  (LCOFS Compl. ¶ 23.)

98.     Just a few months later, in accordance with its powers, the Tribal Governing Board formed and organized the LCO Financial Services LLC on or around May 20, 2013, and "charged [it] with the task to further the economic interests for development of online business ventures" (*Shmakova*, ECF No. 41-2, Resolution No. 13-36), and specifically for pursuing an online consumer lending venture (LCOFS Compl. ¶ 21).

99.     LCO Financial Services' Articles of Organization, By-Laws, and Operating Agreement all state that the Tribal Governing Board alone has the power to appoint the LCO Financial Services' board of directors, which in turn is responsible for the "tribe's online operations," and the company's sole member is the Tribe.  *Shmakova*, ECF Nos. 41-3, 41-4, and 41-5.

100.    Also in 2013, the Tribal Governing Board and Chewning and Johnson had a more formal meeting, where Chewning and Johnson presented pro forma projections and the enterprise's operation.  As described by the Tribe, Chewning and Johnson enticed the Tribal Governing Board—which was desperate to create new revenue streams—to participate in the enterprise with promises of economic benefits "that effectively attempted to 'rent' the Tribe's sovereignty for their own financial gain."  (LCOFS Compl. ¶ 81.)  Chewning and Johnson promised these economic benefits for the Tribe while requiring little involvement in the actual business as Chewning and Johnson's affiliates "offered comprehensive loan servicing at every level of the enterprise" and "would even provide financing to launch."  (*Id.* ¶ 23.)

101.    Because it reviewed financial projections before it determined to participate in the enterprise, it is evident that the Tribal Governing Board knew that the lending enterprise would charge American consumers triple digit interest rates.  (*Id.* ¶ 27.)  The Tribal Governing Board also knew that Chewning and Johnson had previously used the offshore entities to add a veneer of legality to illegal loans and that, as regulators began scrutinizing such arrangements, "they needed to diversify their holdings," i.e., find a new scheme that provided "some protection from liability and made it notoriously difficult for consumers to have any kind of meaningful recourse."  (*Id.* ¶ 26.)  Knowing this, the Tribal Defendants agreed to participate in the scheme.

102.    In furtherance of the scheme, LCO Financial Services formed Hummingbird Funds LLC in March 2014, which did business as Blue Trust Loans.  *Shmakova*, ECF No. 41-6.  Miinan Funds was formed by at least February 2016 and does business as Ladder Credit, and Opichi Funds, LLC was formed by at least February 2022, and does business as eLoanWarehouse.  (Internet Archives for www.laddercredit.com and www.eloanwarehouse.com, and www.laddercredit.com and www.eloanwarehouse.com as of July 11, 2022.)

103.    These LLCs were formed pursuant to the LCO Financial Services, LLC's "formation documents," which "authorize[d] [LCO Financial] to form wholly-owned subsidiary companies of which [LCO Financial] shall be the sole owner." *See, e.g., Shmakova*, at ECF No. 41-6, Resolution No. 14-01.

104.    Although Plaintiffs maintain that the Tribal Defendants are not involved in the day-to-day management and operations of the lenders, the Tribal Governing Board's acquiescence in and facilitation of the illegal lending enterprise is a key component.  Critically, the Tribal Governing Board permitted LCO Financial Services officers, such as Defendant Harden, to sign agreements with Chewning and Johnson and their affiliates, and permitted Chewning and Johnson to make usurious loans to consumers in the name of tribal entities and purportedly under tribal law.  To this day, as CEO of LCO Financial Services, Defendant Soli has "direct oversight and control over Hummingbird and Miina."  (LCOFS Compl. ¶ 39.)

105.    The Tribe's involvement as the nominal lender of Plaintiffs' loans was part of a coordinated effort intended to enable the Cane Bay Defendants to exploit tribal sovereign immunity for off-reservation loans and shield those usurious loans from perceived liability under state and federal law.

106.    A key component of the Tribal Defendants' role in the enterprise is agreeing to allow the Cane Bay Defendants to enter into off-reservation loan agreements with triple-digit interest rates on behalf of the lending entities.  This off-reservation conduct violates state and federal law.

107.    The Tribe's lending entities cannot act without the explicit or implicit approval of the Tribal Defendants.  Among other things, if the Tribal Defendants were enjoined from participating in the enterprise and collecting illegal, usurious amounts from consumers on loans

nominally made by tribal entities, it would effectively shut down the unlawful enterprise, including the ability of non-tribal participants to originate and collect on usurious loans through the tribal business model.

108.    Plaintiffs are not seeking any damages from the Tribal Defendants.

109.    Together, as the officials of the Tribal Governing Board, and the LCO Financial Services leadership, the Tribal Defendants are responsible for and can stop the illegal conduct complained of herein, and, in their official capacities, have the power to comply with the law and provide the prospective relief Plaintiffs seek.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Lindenberger**

110.    From her residence in South Carolina, Plaintiff Lindenberger applied for and took out a loan with Hummingbird Funds d/b/a Blue True Loans over the internet on or about August 2019.

111.    The loan was for $600 and had an interest rate of 559.92%.  According to the payment schedule, the finance charge on the loan was $1,973.97.  After the first month, the monthly payment on the loan was $289.68.  Plaintiff Lindenberger paid in excess of the principle amount on the loan before halting payments.  Plaintiff Lindenberger has not received any indication that Blue Trust or Defendants have asserted that the remaining purported balance is no longer owed to Blue Trust.

**Plaintiff Duran**

112.    From her residence in Illinois, Plaintiff Duran applied for and took out a loan with Hummingbird Funds d/b/a Blue True Loans over the internet on five occasions, on or around December 24, 2018, May 31, 2019, February 7, 2020, October 13, 2020, and January 14, 2021.

113. In total, Plaintiff Duran borrowed $3,475.00 and paid back $5,939.90. The interest rate on each of the loans exceed those allowed by Illinois law. Plaintiff Duran ceased paying on the final loan before paying off the balance. Plaintiff Duran has not received any indication that Blue Trust or Defendants have asserted that the remaining purported balance is no longer owed to Blue Trust.

**Plaintiff Harris**

114. From her residence in Illinois, Plaintiff Harris applied for and took out a loan with Hummingbird Funds dba Blue True Loans on or around March 5, 2022. The amount borrowed was $1,000 and the interest rate was 561.75%.

115. From her residence in Illinois, Plaintiff Harris applied for and took out a loan with eLoanWarehouse on or around July 26, 2022. The amount borrowed was $1,479.55 and the interest rate was 371.82%.

116. Plaintiff Harris made payments on both loans before stopping payments. Plaintiff Harris has not received any indication that any remaining purported balance is no longer owed.

## CLASS ACTION ALLEGATIONS

117. Plaintiffs assert claims on behalf of the proposed Class defined as follows:

> All United States residents who entered into loan agreements with Blue Trust Loans or eLoanWarehouse within the applicable statute of limitations. This Class does not include loans that were taken out while a consumer was located in Utah or Nevada.

118. Plaintiffs Harris and Duran also asserts claims on behalf of the proposed Illinois Class defined as follows:

> All Illinois residents who entered into loan agreements with Blue Trust Loans or eLoanWarehouse within the applicable statute of limitations.

119. Plaintiff Lindenberger also asserts claims on behalf of the proposed South Carolina Class defined as follows:

All South Carolina residents who entered into loan agreements with Blue Trust Loans or eLoanWarehouse within the applicable statute of limitations.

## A. Numerosity

120. There are hundreds or thousands of members of the Classes. Thus, the Classes are so numerous that joinder of all members is impracticable.

## B. Commonality

121. There are numerous common questions of law and fact common to Plaintiffs and the members of the Classes. These questions include, but are not limited to, the following:

  a. Whether Defendants violated RICO by charging interest rates more than the twice the legal limit under state law;

  b. Whether Defendants are protected by tribal sovereign immunity;

  c. Whether Defendants engaged in unfair or deceptive acts or practices;

  d. Whether Defendants constitute an "enterprise" under RICO;

  e. The scope of any injunctive or prospective relief; and

  f. The proper measure and amount of damages for the Classes.

## C. Typicality

122. Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Plaintiffs, like members of the Classes, took out usurious loans from Defendants. Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

## D. Adequacy

123. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating tribal lending cases.

Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with the Classes'.

## E.    Injunctive Relief

124.    The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

## F.    Predominance and Superiority

125.    The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a.    Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.    The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.    Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(On Behalf of Plaintiffs and the Classes)**
**(Class Claims against Cane Bay Defendants)**

126.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

127.    Each Cane Bay Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

128.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Defendants involved in the scheme, is in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the use of a tribal lending scheme.

129.    The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities. The Tribe served as a front for the lending business and provided the veneer of sovereign immunity. The Cane Bay Defendants ran and operated the business, reaping the profits from the usurious loans.

130.   The Cane Bay Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

131.   RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

132.   All of the loans made to the class members and collected by Defendants included an interest rate far in excess of twice the enforceable rate in their respective states.

133.   Defendants charged Plaintiffs and class members interest rates in excess of the maximum rate allowed under state law knowingly, deliberately, intentionally, and willfully, with the purpose of taking more than twice the legal rate of interest for the money loaned to Plaintiffs.

134.   Defendants' conduct was not the result of good-faith error, but instead was a knowing, deliberate, intentional, and willful scheme to circumvent Illinois, South Carolina, and other state law, and to collect interest at rates more than twice that allowed under Illinois, South Carolina, and other state laws.

135.   Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

136.   This conduct began at the latest in 2014 and continues to date, and will be repeated again and again in the future, to the detriment of consumers in states with similar usury laws.

137.    Accordingly, the Cane Bay Defendants are jointly and severally liable to Plaintiffs and the class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

138.    Plaintiffs and the Classes seek an injunction ordering the Cane Bay Defendants to divest themselves of any interest in the Enterprise, prohibiting the Cane Bay Defendants from continuing to engage in the Enterprise, and ordering the dissolution of any entity associated with the Enterprise.

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(d)**
**(On Behalf of Plaintiffs and the Classes)**
**(Class Claims against the Cane Bay Defendants)**

139.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

140.    Each Cane Bay Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

141.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Defendants involved in the scheme, is in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the use of a tribal lending scheme.

142.    The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities. The Tribe served as a front for the lending business and provided the veneer of sovereign immunity.  The Cane Bay Defendants ran and operated the business, reaping the profits from the usurious loans.

143.     The Cane Bay Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt.  Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

144.     This conduct began at the latest in 2014 and continues to date, and will be repeated again and again in the future, to the detriment of consumers in states with similar usury laws.

145.     Accordingly, the Cane Bay Defendants are jointly and severally liable to Plaintiffs and the class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

146.     Plaintiffs and the Classes seek an injunction ordering the Cane Bay Defendants to divest themselves of any interest in the Enterprise, including the receipt of racketeering profits, prohibiting Defendants from continuing to engage in the Enterprise, and ordering the dissolution of each entity that has engaged in the Enterprise.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**
**(Class Claims against the Cane Bay Defendants)**

147.     To the detriment of Plaintiffs and the class members, the Cane Bay Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from Plaintiffs and class members.

148.     As between the parties, it would be unjust for the Cane Bay Defendants to retain the benefits attained by their actions.  Accordingly, on behalf of themselves and members of the Classes, Plaintiffs seek a full accounting and restitution of the Cane Bay Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## FOURTH CAUSE OF ACTION
### Civil Conspiracy
### (On Behalf of Plaintiffs and the Classes)
### (Class Claims against Defendants)

149.    All of the loans made to Plaintiffs and class members violated Plaintiffs' and the class members' respective states' interest rates and lending laws.

150.    The Cane Bay Defendants conspired amongst themselves, with the Tribal Defendants, and other actors to violate state usury and lending laws and profit from those violations.

151.    Accordingly, on behalf of themselves and the members of the Classes, Plaintiffs seek to recover from the Cane Bay Defendants, jointly and severally, all amounts repaid on any loans with Defendants.

152.    Plaintiffs also seek appropriate injunctive relief against the Cane Bay and Tribal Defendants to cease lending illegally.

## FIFTH CAUSE OF ACTION
### Violation of South Carolina Unfair Trade Practices Act
### (On Behalf of Plaintiff Lindenberger and the South Carolina Class)
### (Class Claims against Defendants)

153.    Plaintiff Lindenberger realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

154.    The South Carolina Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20.

155.    By willfully engaging in the illegal lending scheme described in this Complaint, Defendants committed unfair or deceptive acts or practices.

156.    Plaintiff Lindenberger and the South Carolina Class members seek actual damages, treble damages, injunctive relief, and attorneys' fees and costs from the Cane Bay Defendants. S.C. Code § 39-5-140.

157.    Plaintiff Lindenberger also seeks appropriate injunctive relief against the Cane Bay and Tribal Defendants to cease lending illegally.

**SIXTH CAUSE OF ACTION**
**Violation of Illinois Consumer Installment Loan Act– 205 ILC 670/15**
**(On behalf of Plaintiffs Duran and Harris and the Illinois Class)**
**(Class Claims against Defendants)**

158.    Plaintiffs Duran and Harris reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

159.    Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less.  205 ILCS 670/15.  Small consumer loan lenders are required to be licensed to make loans.  205 ILCS 670/1.

160.    If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

161.    Defendants violated Illinois law by charging interest rates making small consumer loans without a license and charging interest rates far in excess of those permitted.

162.    As a result of these unlawful loans, Plaintiffs Duran and Harris and the Illinois Class are entitled to recover damages, attorneys' fees, and costs pursuant to 205 ILCS 670/20(b); 205 ILCS 670/20.7 against the Cane Bay Defendants.

163.    Plaintiffs Duran and Harris also seek appropriate injunctive relief against the Cane Bay and Tribal Defendants to cease lending illegally.

## SEVENTH CAUSE OF ACTION
### Violation of Illinois Interest Act- 815 ILCS 205
**(On behalf of Plaintiffs Duran and Harris and the Illinois Class)**
**(Class Claims against Defendants)**

164.    Plaintiffs Duran and Harris reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

165.    The Cane Bay Defendants contracted for and collected loans at more than 9% interest from Plaintiffs Duran and Harris and the Illinois Class members, in violation of 815 ILCS 205/4.

166.    Plaintiffs Duran and Harris and the Illinois Class members are entitled to damages and fees under 815 ILCS 205/6 against the Cane Bay Defendants.

167.    Plaintiffs Duran and Harris also seek appropriate injunctive relief against the Cane Bay and Tribal Defendants to cease lending illegally.

## EIGHTH CAUSE OF ACTION
### Violation of Illinois Consumer Fraud Act – 815 ILCS 505/2
**(On behalf of Plaintiffs Duran and Harris and the Illinois Class)**
**(Class Claims against Defendants)**

168.    Plaintiffs Duran and Harris reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

169.    The Cane Bay Defendants, in the course of trade or commerce, engaged in unfair acts and practices, in violation of 815 ILCS 505/2, by contracting for and collecting finance charges, interest, and fees, from Illinois residents, in excess of the amounts permitted by Illinois law, and in violating the Illinois Predatory Loan Prevention Act.

170.    These unlawful charges caused actual damages to the Plaintiff Duran and Harris and the Illinois Class.

171.    Pursuant to 815 ILCS 505/10a, Plaintiffs Duran and Harris and the Illinois Class seek damages and attorneys' fees and costs against the Cane Bay Defendants.

172.    Plaintiffs Duran and Harris also seek appropriate injunctive relief against the Cane Bay and Tribal Defendants to cease lending illegally.

## NINTH CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(c)-(d)**
**(On Behalf of Plaintiffs and the Classes)**
**(Class Claims against Tribal Defendants in their official capacities)**

173.    Plaintiffs realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

174.    The Tribal Defendants are each being sued in their official capacities as members of the Tribal Governing Board and/or as officers or directors of LCO Financial Services, LLC.

175.    Each of the Tribal Defendants is a "person" as that term is defined in 18 U.S.C. § 1964(3).

176.    The Enterprise, consisting of the Tribal Defendants, and the Cane Bay Defendants, and the unnamed officers, executives, and other employees of these companies and the Cane Bay Defendants' other companies, is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States.

177.    The Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

178.    The Tribal Defendants violated and continue to violate 18 U.S.C. § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the by authorizing the Cane Bay Defendants to enter agreements with consumers throughout the United States that are illegal under state law on behalf of tribal entities and purportedly under tribal law, and by collecting the resulting unlawful debt.

179.    RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was uncured in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

180.    All of the loans made to class members and collected by the Enterprise and others, included interest rates far in excess of twice the enforceable rate in the class members' states.

181.    Plaintiffs and class members were injured as a direct result of the Tribal Defendants' violations of 18 U.S.C. § 1962(c), by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

182.    This conduct began at the latest in 2014, continues to date, and will be repeated again and again in the future to the detriment of consumers nationwide.

183.    The Tribal Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each of the Tribal Defendants knowingly and willfully agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

184.    Plaintiffs and the class members were injured as a direct result of the Tribal Defendants' violations of 18 U.S.C. § 1962(d) by, among other thing, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

185.    This conduct began at the latest in 2014, continues to date, and will be repeated again and again in the future to the detriment of consumers nationwide.

186.    The Tribal Defendants participated and continue to participate in the collection of the unlawful debt by aiding, abetting, procuring proceeds from the Enterprise, and willfully investing money in the Enterprise for the purpose of the unlawful scheme.

187.    Plaintiffs seek prospective injunctive and declaratory relief for the Tribal Defendants' conduct, including an order: (1) barring the Tribal Defendants from continuing to make loans to consumers that exceed the legal interest rates for consumers residing in each state; (2) prohibiting Tribal Defendants from continuing to collect on the unlawful loans; (3) requiring Tribal Defendants to ensure that all accounts are deleted from consumers' credit reports; and (4) requiring the Tribal Defendants to send notice to consumers explaining that their loans are void and unenforceable.

**TENTH CAUSE OF ACTION**
**Declaratory Judgment, 28 U.S.C. § 2201**
**(On behalf of Plaintiffs and Illinois and South Carolina Classes)**
**(Class Claims against Tribal Defendants in their official capacities)**

188.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

189.    South Carolina, Illinois, and many other states require all who engage in the business of making small loans to be licensed.

190.    Defendants were not licensed to make loans in South Carolina, Illinois, or any other state in the United States.

191.    Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void in South Carolina, Illinois and many other states.

192.    In addition to licensing violations, Defendants' loans violated the general usury laws of many states including South Carolina and Illinois. Thus, the loans violated the general usury statutes of many states and are void pursuant to those laws.

193.    Further, the lending agreements used for Plaintiffs' and class members' loans contained unconscionable choice of law, forum selection, and class action waivers provisions that are void and unenforceable.

194.    Because of the triple digit interest rates, class members with unpaid balances are subject to significant liability as the interest accrues on their unpaid debts.

195.    Plaintiffs' and the members of the Illinois and South Carolina Classes' loans are likely to be subject to being reported to credit bureaus wherein such reporting reflects any late payments and accrual of significant liability as interest accrues according to the unlawful triple digit interest rates.

196.    Resolution of the validity and enforceability of the outstanding balance on Plaintiffs' and class members' loan agreements by this Court will determine the rights and interests of the parties to their respective agreements.

197.    Thus, the validity and enforceability of Plaintiffs' and class members' loan agreements, including but not limited to any outstanding balances, presents a substantial, non-speculative controversy between parties with adverse legal interests of sufficient immediacy and reality.

198.    Accordingly, Plaintiffs, on behalf of themselves and the members of the Illinois and South Carolina Classes, seek a determination that their loans are void and unenforceable, and that they are not obligated to pay any principal and/or interest outstanding on the illegal loans under their respective state laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.      An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

C.      An Order declaring that Defendants have committed the violations of law alleged herein;

D.      An Order providing for any and all injunctive relief the Court deems appropriate;

E.      An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.      An Order awarding statutory, exemplary, or treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.      An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.      An Order awarding Plaintiffs the reasonable costs and expenses of suit, including attorneys' fees; and

I.      Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Date: November 10, 2022                    /s/Sophia Rios

                                         E. Michelle Drake, Bar No. 0387366
                                         John G. Albanese
                                         BERGER MONTAGUE PC

1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

Sophia Rios
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Telephone: (858) 252-6649
Facsimile: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs*